## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Criminal No. 11-CR-10310-MLW |
| v.   ) | |
| ) | |
| STEVEN SOTO, ) | |
| PEDRO SOTO, and ) | |
| CARMEN SOTO ) | |
| ) | |

### Government's Sentencing Memorandum

On June 21, 2013, the defendants were each convicted after a three-week trial of several counts of mail fraud, in violation of 18 U.S.C. § 1341, in connection with a scheme to defraud financial institutions by acquiring mortgage loans under false pretenses, including misrepresentations about the qualifications and identities of the borrowers.  In addition, Steven and Pedro Soto were each convicted of several counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A.  The United States submits this memorandum in support of its sentencing recommendation and to respond to the defendants' arguments that the Court should depart from the guideline sentencing range (GSR).  In this memorandum, the government presents (1) a brief summary of the offense conduct; (2) the government's position on the calculation of the advisory Sentencing Guidelines; and (3) an explanation of the government's sentencing recommendations.

The government recommends that the Court impose sentences at the low end of the GSR for Pedro and Carmen Soto, in addition to a two-year consecutive sentence of imprisonment for Pedro Soto for his violation of 18 U.S.C. § 1028A.  The government recommends that the Court vary below the Guideline range for Steven Soto to account for his having served 37 months of imprisonment as a result of a federal conviction for related conduct.

## I.      Offense Conduct

The PSR for each defendant summarizes the offense conduct at ¶¶ 1–12.  Rather than repeat all the evidence in detail here, the government will briefly review the transactions that were the subject of the trial, focusing on facts especially material to sentencing.

### A.      242 Main St., Springfield

The evidence at trial established that Pedro Soto owned this property and was in arrears on his mortgage payments in November 2006.  In order to sell the property, Pedro employed Kim Litwin, a co-conspirator recruited by Steven Soto.  The straw buyer was Litwin's jailed nephew, Gregory Bradley.  All three defendants dealt with the mortgage broker to arrange financing.  Closing attorney Javier Pico was concerned that he had not met or spoken to Bradley—an unusual occurrence, in his experience—and, therefore, asked Pedro to put him in touch with Bradley.  Shortly thereafter, Steven called Pico, claiming to have Bradley on the telephone.  Pico reviewed the mortgage loan application with the Bradley impersonator, who affirmed the accuracy of the false statements on the loan application.

Pico also arranged for his paralegal, John Fonseca (another trial witness) to confirm the identity of Milagros Espinal, the notary whose stamp and seal Steven Soto counterfeited.  The counterfeit stamp appeared below Bradley's forged signature on the power of attorney sent to Pico's firm in advance of the closing and on the power of attorney used at the closing.  Fonseca asked Steven to have the notary provide proof of her identity and a copy of her authorization to perform notary services.  The following day, Fonseca received by fax a counterfeit Milagros Espinal driver's license and notary authorization, sent from the defendants' company, Paradise Real Estate.  This satisfied the closing attorney such that he permitted the closing to go forward.

### B.    55 Lawrence Street, Salem

The series of fraudulent transactions involving this property began with Pedro Soto introducing Steven Soto to the property owner, Beatrice Jimma Shea, as Gregory Bradley.  As the Court heard on an audio recording that Shea made of her last conversation with Steven posing as Bradley, Steven unsuccessfully pressed Shea to sign a document that would permit him to convert her property into condominiums and sell them.  She refused.  Undeterred, Steven, along with his parents, fraudulently acquired title to the property and converted it into three condos, which they sold to two straw buyers.  The fraud was accomplished, in part, with the use of Milagros Espinal's notary stamp and Gregory Bradley's name and driver's license.

The first straw buyer was Pamela Landess, a woman involved romantically with Pedro Soto.  The other straw buyer, who bought two of the condos, was Medelin de la Cruz, a friend and client of Carmen Soto.  De la Cruz had recently purchased her own condominium, was not qualified to buy two others, and had no intention of occupying or paying the mortgage on either.

When de la Cruz learned that the U.S. Secret Service wanted to speak with her, she immediately called Carmen Soto.  Carmen counseled de la Cruz falsely to tell the Secret Service that she bought both Units 2 and 3 as an investment.  She also gave de la Cruz a description of the properties so that she could more persuasively lie to federal authorities.  Independently, Steven called de la Cruz and gave her the same advice.

### C.    399 Orange Street, Springfield

Steven and Pedro Soto engineered this transaction as a purchase in Gregory Bradley's name.  Steven again recruited Litwin's help, telling her, along the way, that he would attend the closing posing as Bradley.  As additional proof that Steven in fact attended the closing, the paralegal who oversaw the transaction testified that the person she believed to be Bradley gave

her his e-mail address and telephone number.  The former was Steven's; the latter Pedro's.

Pedro Soto made arrangements with the closing attorney, telling the attorney that Bradley would

attend the closing.  Pedro of course knew this to be false; he knew Bradley was in prison, and he

had previously introduced his son to Shea as Gregory Bradley.

### D.     21 Dudley Street, Haverhill

Chris and Karen Faison met with all three defendants to discuss Paradise Real Estate

handling the sale of their home.  Again, the defendants tried to recruit straw buyers.  Carmen

successfully recruited her cousin, trial witness Raquel Pieraldi as the straw buyer for one unit.

While Pieraldi admitted that Carmen Soto had arranged for Pieraldi's purchase of the Dudley

Street condominium, her testimony was otherwise manifestly false.  For example, Pieraldi

claimed that she bought the Dudley Street condominium—her first and only real estate

purchase—without ever stepping foot on the property or having any knowledge of, among other

things, the property's heating, plumbing, or electrical systems, or the condition of its roof.

Pieraldi further claimed that she never moved into the property because she was renting an

apartment elsewhere.

In contrast, Angel Rodriguez, the straw buyer whose name was used to buy the other two

condominiums, testified that he told Carmen Soto, a woman he admired deeply, that he had

decided not to go forward with the purchase of any real estate.  Using a document purporting to

grant Rodriguez's power of attorney to Steven Soto's girlfriend, the defendants nonetheless

forged ahead with the deals—a decision with long-term adverse consequences for Rodriguez's

ability to obtain credit.  The counterfeit power of attorney bore the signature of a notary public,

Yaimet Vallejo, whom Rodriguez knew to be a relative of Carmen.  That power of attorney was

instrumental at closing.  The U.S. Secret Service found this document, along with an earlier cut-and-paste iteration, in the defendants' dining room during a search conducted in May 2007.

After the 2007 search of the defendants' home, Carmen Soto, along with Yaimet Vallejo, sought out Angel Rodriguez.  Carmen urged Rodriguez to sign Vallejo's notary log to affirm falsely that he had, in fact, signed the counterfeit power of attorney.  Rodriguez's trial testimony on this point is memorable, as he was visibly shaken by the memory of telling the defendant that he would not lie on her behalf.

## II.     The PSRs Accurately Calculated Each Defendant's GSR

The government agrees with the Probation Office's calculation of each defendant's GSR, which is as follows:

**Steven Soto**:        Total Offense Level: 25
                        Criminal History Category: III
                        GSR: 70–87 months

**Pedro Soto**:         Total Offense Level: 23
                        Criminal History Category: I
                        GSR: 46–57 months

**Carmen Soto**:        Total Offense Level: 23
                        Criminal History Category: I
                        GSR: 46–57 months

Each defendant challenges certain Guideline enhancements applied by the Probation Office.  Below, the government addresses certain of the challenged enhancements in turn.

### A.      The Probation Office Accurately Calculated Loss

Each defendant challenges the loss amount attributed to him or her, but the Probation Office's calculations are correct.  The Probation Office determined the total loss caused by the fraud scheme to be $1,055,474, of which the entire amount is attributable to Steven and Pedro Soto, and of which $792,559 is attributable to Carmen Soto.  *See* Steven Soto PSR at ¶¶ 12, 21;

Pedro Soto PSR at ¶¶ 12, 20 and Carmen Soto PSR at ¶¶ 12, 21.  As with other sentencing enhancements, "[t]he government bears the burden of proving a victim's losses by a preponderance of evidence," although the final amount of loss need only be approximate.  *United States v. Curran*, 525 F.3d 74, 78 (1st Cir. 2008).  Here, the loss amount reflected in the PSRs is substantiated by evidence the government presented at trial.

>    *1.     The PSRs' Loss Calculation Methodology is Correct*

The Court should adopt the PSRs' loss calculation methodology and thus reject the defendants' objections to it.  The PSRs follow the rule set by the First Circuit in *United States v. Appolon*, 695 F.3d 44 (1st Cir. 2012), which says that a sentencing court should "calculate[] actual loss by subtracting from the outstanding balance on the mortgage loan either the sum recouped via foreclosure or, if there was no foreclosure, the property's fair market value at the time of sentencing."  695 F.3d at 68.  The court should seek to measure "the net value of what was taken—in other words, the difference in value between what was given and what was obtained."  *United States v. James*, 592 F.3d 1109, 1115 (10th Cir. 2010).

The defendants acknowledge *Appolon*'s formula, but they focus on the values listed on the foreclosure deeds or on appraisals rather than the amounts for which the lenders ultimately sold the affected properties.[1]  *See* S. Soto Mem. at 12–13; P. Soto Mem. at 3–6; C. Soto Mem. at 2–3.  Had they cared to, the defendants suggest, the lenders in this case could have gotten much more money for the properties.  Instead, they sold the properties to "bargain-hunting third parties for prices dramatically less than their appraised value."  S. Soto Mem. at 12.

---

[1] The defendants' attempts to distinguish *Appolon* on the basis of the inflated appraisals at issue in that case are distractions.  *See, e.g.*, P. Soto Mem. at 3.  *Appolon*'s holding regarding the proper loss calculation methodology was not a function of the inflated appraisals involved in that case.

Contrary to the defendants' suggestion, foreclosure deed values in no way reflect the amount reasonably recoverable by the lenders.[2]  As the defendants point out, in Massachusetts, as collateral for their loans, mortgage lenders obtain a right to acquire an estate in the relevant property if it purchases the property at the foreclosure sale.  *See* S. Soto Mem. at 13 (citing *Santiago ex rel. Santiago v. Alba Mgmt.*, 928 N.E. 2d 359, 362 (2010)).  If, after a borrower forecloses, the lender itself buys the property at a foreclosure sale, it takes possession of the deed, ends the borrower's equity of redemption, and becomes the full owner of the property.  *See Santiago*, 928 N.E. 2d at 362.  The lender is bound by law to apply the purchase price to the satisfaction of the mortgage debt.  *See id.*

Lenders often purchase foreclosed property at foreclosure sales because the other bids at the foreclosure sale are so low.  Usually, "[t]here is no right for prospective buyers (or the foreclosing party [the lender]) to inspect the property before the foreclosure sale," which means that "third parties tend to discount foreclosure sale purchase bids heavily."  Office of Inspector Gen., Federal Housing Finance Agency, *An Overview of the Home Foreclosure Process* at 14, *available at* http://fhfaoig.gov/Content/Files/SAR%20Home%20Foreclosure%20Process_0.pdf (last visited Oct. 3, 2013).  Because of the uncertainties that prospective buyers face at foreclosure auctions, "there are relatively few bidders in most foreclosure sales other than the foreclosing party."  *Id.*

As a result, "[m]ost foreclosure sale properties are purchased by the foreclosing party via a 'credit bid,'" *id.*, which is "a bid that offers to cancel the outstanding principal, interest, and related fees in return for title to the property," *United States v. Green*, 648 F.3d 569, 584 (7th Cir.

---

[2] Naturally, neither do the pre-mortgage appraisal values of the affected properties, which the defendants also argue might form the basis for the Court's loss calculation.  *See* P. Soto Mem. at 3–4; C. Soto Mem. at 3 & Exs. 1–4.  Those appraisals show what the property was worth when the lenders made the loans, not what it was worth on the market when the lenders were forced to sell the properties.

2011).  Credit bids may not always equal the amount owed on the relevant loans—they did not in

this case—but "[b]y credit bidding, the foreclosing party can obtain clear title to the property,

inspect the property, fix it as necessary, and then resell it subsequently."  *Overview of the Home

Foreclosure Process* at 14.

By going through this exercise, lenders hope to obtain more value for the foreclosed

properties than they would get at the foreclosure sale, not less.[3]  As the Seventh Circuit

explained, "[w]here a lender forecloses and acquires the property at public auction by making a

credit bid . . . the credit bid is not a reliable measure of the actual market value of the property."

*Green*, 648 F.3d at 584.  Rather, by obtaining title to the property via a credit bid, lenders aspire

to sell foreclosed property at market value (whatever that turns out to be) later.  If it were

possible for the lenders to obtain the appraised value of the foreclosed properties at the

foreclosure sale, as the defendants suggest—if it were possible for them to sell many of the

properties at no loss at all—why would they pass up the opportunity?

The defendants misunderstand the significance of the foreclosure deeds and the appraisals

to which they point.  The Court should disregard the defendants' alternative loss calculation

methodologies and adhere to the rule set by the First Circuit in *Appolon* and applied by the

Probation Office in the defendants' PSRs.

2.      *All Three Defendants Are Responsible for the Losses Caused by the*
        *Fraudulent Sale of 21 Dudley Units 1, 2, and 3*

Steven Soto argues that the Court should not attribute the losses associated with the three

21 Dudley St. deals with him, but it can, and it should.  Steven was acquitted of the fraud charges

---

[3] The defendants were familiar with this process.  They bought 399 Orange St. (in Bradley's name) from
IB Property Holdings LLC., an InterBay affiliate that sold foreclosed properties.  *See, e.g.*, Trial Ex. 5B at
59 (initialed addendum to contract between Bradley and IB Property Holdings stating "Buyer further
acknowledges and understands that the Property was acquired by the Seller through a foreclosure action
or loan liquidation procedure . . . .").

against him for the sale of 21 Dudley Units 1 and 2, and he was not charged with any crime in connection with the sale of Unit 3. (None of the defendants were.) Nevertheless, the evidence at trial was enough to establish, under a preponderance standard, that all three of the defendants, Steven included, participated in the fraudulent sale of the three condos at 21 Dudley St. The losses associated with those sales are appropriately included in the calculation of loss that the defendants caused.

Steven appears to concede that the Court *can* hold the 21 Dudley St. losses against him, but he argues that doing so would "raise[] serious fairness and Constitutional concerns."[4] S. Soto Mem. at 7. It would not. There is ample evidence for the Court to conclude that all three defendants, not just Carmen, participated in the Dudley St. frauds.

It is entirely implausible that Carmen committed the Dudley St. frauds without Steven and Pedro's help. As the evidence at trial proved, the defendants' scheme was a family affair, with Pedro and Steven as its principal architects. Both Pedro and Steven were intimately involved in all of the fraudulent deals leading up to the 21 Dudley sales, and Steven was so dedicated to his work that he continued to orchestrate the sale of the final 55 Lawrence St. condo from jail. Carmen—the only Soto convicted of fraud relating to 21 Dudley St.—was incorporated comparatively late, with the sale of the 55 Lawrence condos in January and February of 2007. Although her role in the Lawrence St. deals was substantial, it was also

---

[4] Steven Soto points to *United States v. Pimental*, 367 F. Supp. 2d 143, 150–54 (D. Mass. 2005), to call into question the inclusion of the acquitted conduct in his sentencing calculation. Since *Pimental*, however, the First Circuit has addressed this issue definitively: it is appropriate to include acquitted conduct in the determination of a defendant's sentence. *See United States v. DeSimone*, 699 F.3d 113, 128 (1st Cir. 2012 (holding that "[a] court 'may consider acquitted conduct in determining the applicability vel non of a sentencing enhancement'" (quoting *United States v. Paneto*, 661 F.3d 709, 715 (1st Cir. 2011)); *United States v. Gerhard*, 615 F.3d 7, 34 (1st Cir. 2010) (holding that "'acquitted conduct, if proved by a preponderance of the evidence, . . . may form the basis for a sentencing enhancement'" (quoting *United States v. Gobbi*, 471 F.3d 302, 314 (1st Cir. 2006)).

subsidiary.  *See, e.g.*, Trial Ex. 29 at 10 (transcript of conversation in which Carmen reports to

Steven that she and Pedro had "completed [Steven's] mission).

The evidence adduced at trial supports the inference that Carmen received assistance on

the Dudley St. transactions from Steven and Pedro.  For instance, loan originator Ruben Acosta

testified that Steven Soto was his point of contact for the 21 Dudley Unit 1 transaction.[5]  Acosta

explained that Pedro had put the two in touch.  Once Steven brought Acosta the potential loan,

Acosta dealt exclusively with Steven.  From Steven Soto, Acosta obtained the information on

Angel Rodriguez's loan application—information that included the fraudulent representation that

Rodriguez intended to occupy the property.

In addition, all three defendants were involved in negotiations and meetings with the

Faisons (the sellers of 21 Dudley St.), and all three defendants stood to gain from the sale of the

property.  The Faisons worked with Steven, Pedro, and Carmen to sell their property, as

evidenced by Karen Faison's e-mail to the trio giving a summary of the financial transactions

between the Faisons and the defendants.  *See* Trial Ex. 30 (referencing "Pedro's figure").  The e-

mail encompassed the sale of all three units, linking all three defendants to the full loss for the

Dudley St. frauds.  The inclusion of Steven and Pedro on that e-mail was consistent with a fax

from Carmen to Faison, which said, in the remarks, "any questions call Pedro or Steven."  Trial

Ex. 37 at 1.  The Faisons testified that Steven was present at the Dudley St. closings, and the

presence of a copy of Pedro's driver's license in the attorney closing file for 21 Dudley Unit 1

(*see* Trial Ex. 6A at 34) suggests that he was present for at least one of those closings as well.

---

[5] Acosta testified that he was not sure whether he obtained the information about Rodriguez from
Rodriguez himself or from Steven, but Rodriguez testified that he never spoke with Acosta. For
sentencing purposes, the Court may credit Rodriguez's testimony and conclude that it was Steven Soto,
not Angel Rodriguez, who dealt with Acosta.

On top of all this, both Steven and Pedro appear on a good deal of paperwork related to the Dudley St. transactions, some found in their home and some in business records kept elsewhere. As Steven's ex-girlfriend Yessica Amaro explained, the defendants' home, where all three defendants lived, was their workshop, with the dining room serving as the common area for work related to their real estate business and scams. There, along with the Angel Rodriguez power of attorney with the cut-and-paste signature (Trial Ex. 70), investigators found draft versions of deal paperwork showing Steven and Pedro, alternately, as buyers and sellers of various components of the 21 Dudley St. property. *See, e.g.*, Trial Ex. 37 at 2, 4 (paperwork, including Offer to Purchase and Lease With Option to Purchase, identifying Steven as buyer of 21 Dudley St. in its entirety); Trial Ex. 46 at 1 (Purchase and Sale Agreement, signed by Pedro, identifying Pedro as seller of 21 Dudley Unit 1 to Angel Rodriguez); Trial Ex. 53 (portion of P&S identifying Pedro as seller of an unidentified property sold to Raquel Pieraldi and Franklin Polanco, eventual purchasers of 21 Dudley Unit 3). And the final Purchase and Sale Agreement between the Faisons and Angel Rodriguez for 21 Dudley Unit 1, kept in the attorney closing file, bears the handwritten initials *PS*.[6] Trial Ex. 6A at 42.

The sale of the Dudley St. condos followed the pattern set by the sale of the 55 Lawrence St. condos, which Steven directed: acquire a triple-decker; split it into condos; and sell the condos to straw buyers using fraudulently obtained loans. Given the demonstrable involvement of Steven and Pedro in the sale of the Dudley St. condos, it is unreasonable to conclude that the pair was not aware of the fraudulent aspects of the deals. The better inference is that they were

---

[6] Indeed, in the closing attorney file for 21 Dudley Unit 1, Pedro Soto appears as the seller on an entire set of a paperwork that mirrors the paperwork eventually signed by the Faisons. *See generally* Trial Ex. 6A. In places, including a HUD-1 settlement statement, Pedro's signature even appears alongside buyer Angel Rodriguez's. *See id.* at 7. The sale of Unit 1, structured with Pedro as the seller, seems to have proceeded far enough for the closing attorney to prepare a check for Pedro to receive when the deal closed, although accounting documents for the closing attorney's firm suggest that the money was never paid to him. *See id.* at 40, 35–36.

aware of those aspects but helped Carmen with the deals anyway because all three defendants

would profit from them.  More than a fair preponderance of the evidence supports this

conclusion.

> 3.      *The Losses Caused by the Defendants Were Reasonably Foreseeable*

Contrary to the protestations of all three defendants, they could have foreseen the losses

they caused.  A defendant is presumed to be responsible for the entire loss he causes, including

loss associated with market conditions and other factors extraneous to his conduct.  *See United*

*States v. Shattuck*, 961 F.2d 1012, 1016 (1st Cir. 1992).  "The appropriate test is not whether

market factors impacted the amount of loss, but whether the market factors and the resulting loss

were reasonably foreseeable."  *United States v. Parish*, 565 F.3d 528, 535 (9th Cir. 2009).  In a

mortgage fraud scheme like this one, which used unqualified straw buyers and was operated by

industry professionals "who understood mortgages and the housing market sufficiently to design

a method of defrauding lenders of [over a million dollars]," "the total loss resulting from the

mortgage fraud—including loss to secondary lenders—is entirely foreseeable."  *James*, 592 F.3d

at 1117–18 (Lacero, C.J., concurring).  "Even if the deterioration of the Boston real estate market

during the recent recession also played some macroeconomic role in" creating the losses now

being attributed to the defendants, the defendants "could reasonably have expected that they were

contributing to the emergence of those poor market conditions."  *Id*.

The defendants in this case owned a real estate business, and they understood that real

estate prices rise and fall, sometimes a great deal.  Their entire scheme was an attempt to insulate

themselves from the vicissitudes of their chosen marketplace; by selling property to fake buyers,

the defendants never had to worry that they would not obtain their asking price or that a property

would not sell quickly enough.  *See* Trial Ex. 78B at 2 (Steven Soto: "That's how I deal, quick,

quick. . . . You know that if I put that on the market, it's not gonna sell that quickly."). Furthermore, they knew enough about the market to understand what happens when mortgage borrowers default and properties go into foreclosure. Like the defendants in *Appolon*, these defendants "could reasonably have anticipated that the properties [involved in their scheme] would be grossly devalued" where they were using unqualified straw buyers who would almost certainly default on their loans and likely be foreclosed upon. *Appolon*, 695 F.3d at 69. They should be held accountable for the full amount of the loss that they caused.

**B.     An Obstruction of Justice Enhancement is Appropriate for Carmen and Steven Soto**

The PSR correctly increased Carmen and Steven's offense levels by two points under U.S.S.G. § 3C1.1 because both attempted to obstruct the government's investigation of their offenses. Carmen attempted to obstruct justice twice, once when she tried to convince Angel Rodriguez to sign her cousin's notary book to conceal the defendants' forgery of his signature and again when she instructed straw buyer Medelin de la Cruz what to tell the police about de la Cruz's two fake condo purchases. Steven attempted to obstruct the investigation only once, when he gave de la Cruz the same instructions as his mother did, but once suffices.

The Sentencing Guidelines call for an increase in a defendant's offense level if he "willfully obstructed or impeded, *or attempted to obstruct or impede*, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction," provided that the obstructive conduct related to the defendant's offense conduct, relevant conduct, or a closely related offense. U.S.S.G. § 3C1.1 (emphasis added). The Application Notes to section 3C1.1 illustrate the scope of the guideline. "[C]ommitting, suborning, or attempting to suborn perjury," for example, all qualify a defendant for an obstruction enhancement. U.S.S.G. § 3C1.1 cmt. n.4(B).

Carmen's pitch to Rodriguez falls squarely within the behavior contemplated by Application Note 4(C) of the obstruction enhancement.  That note says that conduct covered by the enhancement includes "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding."  U.S.S.G. § 3C1.1 cmt. n.4(C) (2012).

That is precisely what Carmen did when she approached Rodriguez during his algebra class in June 2007.[7]  There, she and her cousin, notary Yaimet Vallejo, attempted to persuade Rodriguez to sign Vallejo's notary book in order to corroborate the fiction that Rodriguez had signed a power of attorney form authorizing his step-sister, Yessica Amaro, to purchase two condos in his name.  According to Rodriguez's testimony at trial, Carmen told Rodriguez that she needed him to sign the notary book or else she and Vallejo could get in trouble.  Despite Carmen's pleading, Rodriguez refused to sign.  Had Carmen persuaded him, she would have helped produce a record that she could use to mislead investigators into thinking that Rodriguez's purchases of the two condos at 21 Dudley St. were legitimate.  As it transpired, she merely attempted to produce that record, but attempt is enough to trigger the enhancement.  *See* U.S.S.G. § 3C1.1 & cmt. n.4(C).

Likewise, both Carmen and Steven merit the obstruction enhancement because of their attempts to convince Medelin de la Cruz to lie to investigators about her purchase of 55 Lawrence St. Units 2 and 3.  Separately, Carmen and Steven each coached de la Cruz through potential conversations with the police.  They told her about the appearance of the units she

---

[7] Carmen's assertion that this conduct did not occur during the government's investigation (C. Soto. Mem. at 7) is both wrong and irrelevant.  The government's investigation had begun before this incident, as Carmen well knew; the government searched her home in May 2007.  And in any event, "the fact that there was no pending federal criminal investigation at the time of the obstruction [does] not disqualify a defendant from an enhancement where there [is] a 'close connection between the obstructive conduct and the offense of conviction,'" as there was here.  *United States v. McGovern*, 329 F.3d 247, 252 (1st Cir. 2003).

purchased so that she could pretend to have visited them before buying them, and they told her to say that she had purchased them as an investment as a way of explaining why a Wendy's manager bought two condos immediately after purchasing her own place to live (with Carmen as her broker). The lies that Carmen and Steven proposed were not perfect—they did not explain why the loan paperwork for 55 Lawrence Units 2 and 3 said each condo was to be de la Cruz's primary residence, for instance—but they had the potential to affect the government's investigation and indictment, making them material within the meaning of the Guidelines.[8] *See* U.S.S.G. § 3C1.1 cmt. 6 ("'Material' evidence, fact, statement, or information . . . means evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination."); *see also United States v. Feldman*, 83 F.3d 9, 13 (1st Cir. 1996) ("[T]he test for materiality under the obstruction-of-justice guideline is not stringent.").

This kind of witness coaching is sufficient to trigger the obstruction enhancement, as the First Circuit has held.[9] In *United States v. Batchu*, 724 F.3d 1, 12 (1st Cir. 2013), for instance, the First Circuit affirmed a two-level obstruction enhancement for conduct nearly identical to Steven and Carmen's. In that case, Batchu pled guilty to five charges relating to sexual conduct with a minor named Minor A. *See* 724 F.3d at 5. At sentencing, the government identified three acts justifying a two-level enhancement for obstruction of justice, the third being Batchu's

---

[8] Consider, in contrast, the purchase of 21 Dudley Unit 3—a property not specified in the indictment—by Raquel Pieraldi. Although the preponderance of the evidence proves that the loan financing this purchase was fraudulently obtained, Pieraldi testified that she intended to live in the unit she purchased, and the government did not charge the Defendants with fraud in connection with that transaction.

[9] Other circuits have reached the same conclusion. *See, e.g.*, *United States v. Cabaccang*, 481 F.3d 1176 (9th Cir. 2007) (upholding obstruction enhancement when eight witnesses testified that the defendant "had instructed them to lie if they were questioned by police regarding the money they were laundering"); *United States v. Garner*, 454 F.3d 743, 750 (7th Cir. 2006) (upholding obstruction enhancement when defendant attempted to convince a witness to give false information to investigators). As the Seventh Circuit emphasized in one such case, "the enhancement does not apply by matter of degree of success; it is [the defendant's] attempt that counts." *United States v. Davis*, 442 F.3d 1003, 1009 (7th Cir. 2005) (upholding obstruction enhancement when the defendant "contacted scheme participants and urged them to tell her made-up story to investigators").

"instruction to Minor A that she should 'lie if there was an inquiry from law enforcement that the two of them had had sexual relations.'"  *Id.* at 12.  The First Circuit found that this conduct was "clearly adequate by itself to require application of the enhancement."  *Id.; accord United States v. Voccola*, 99 F.3d 37, 45–46 (1st Cir. 1996) (affirming obstruction enhancement when defendant coached witness not to speak to an investigator and to "avoid grand jury subpoenas").

In his sentencing memorandum, Steven argues that his witness coaching needed to have an effect on the government's investigation in order for the obstruction enhancement to apply, as would be necessary if he himself had lied to the police.[10]  *See* S. Soto Mem. at 15–16 (analogizing to U.S.S.G. § 3C1.1 cmt. n.5(B)).  But in *Batchu*, the First Circuit did not require that the defendant's conduct actually lead to an impediment or obstruction of the investigation, as Steven argues is necessary.  *See* 724 F.3d at 12; *cf. United States v. Phillips*, 367 F.3d 846, 859 (9th Cir. 2004) (distinguishing between lies by the defendant himself, which require actual impediment to trigger the obstruction enhancement, and attempts to influence a witness, which do not).  It was enough that Batchu sought to obstruct the government's investigation by telling Minor A to lie to law enforcement for him.[11]  *See id.* ("[T]he record amply supports a finding that

---

[10] Steven also argues that his conduct was simply unproven because "the only evidence on this issue is self-serving testimony" from de la Cruz.  S. Soto Mem. at 16.  The testimony of one witness, however, if credible, is sufficient to meet the requisite, preponderance-of-the-evidence standard of proof.  *See, e.g.*, *United States v. Voccola*, 99 F.3d 37, 45–46 (1st Cir. 1996) (affirming obstruction of justice enhancement based on the testimony of one witness).  When the obstructive conduct at issue is witness coaching, the testimony of the coached witness will often be the only evidence available.

[11] The First Circuit analyzed Batchu's obstruction as suborning perjury even though Batchu only encouraged lies to the police, not necessarily lies under oath.  *See Batchu* ,724 F.3d at 12 (referencing U.S.S.G. § 3C1.1 cmt. n.4(B)).  The same analysis would be appropriate here, too, but the Court may also analyze the Steven and Carmen's coaching as an attempt to unlawfully influence a witness, which is made punishable by U.S.S.G. § 3C1.1 cmt. n.4(A).  *See, e.g.*, *United States v. Sutton*, 337 F.3d 792, 801 (7th Cir. 2003) (citing Application Note 4(A) for the proposition that "attempting to influence a witness to make false statements to investigating authorities qualifies as an obstruction of justice").  A defendant need not threaten or intimidate a witness for that application note to govern.  *See, e.g.*, *United States v. Jimenez Martinez*, 83 F.3d 488, 497 (1st Cir. 1996) (citing Note 4(A) when a defendant merely called a witness several times to induce him not to testify against him); *United States v. McKeighan*, 685 F.3d 956, 975 (10th Cir. 2012) ("[A] defendant need not actually threaten [a] witness; he need only attempt to

Batchu did indeed seek to obstruct justice by trying to get Minor A to lie for him."). Likewise, it was enough that Steven and Carmen sought to obstruct the government by telling Medelin de la Cruz to lie about the condos she supposedly purchased. The two-level obstruction enhancement is warranted for both of them.

## III.   Government's Sentencing Recommendation

The government recommends that the Court impose sentences at the low end of the GSR for Pedro and Carmen Soto, in addition to a two-year consecutive sentence of imprisonment for Pedro Soto for violation of 18 U.S.C. § 1028A. Steven Soto's conduct also warrants a serious sentence of incarceration, but the government recommends a variance to account for his having served 37 months in prison as a sentence for the crimes for which the jury convicted him before Judge Tauro. As discussed below, therefore, the government recommends a sentence below the GSR for Steven Soto—65 months—based on factors set forth in 18 U.S.C. § 3553(a). Viewed in light of the § 3553(a) factors, the defendants' conduct calls for a substantial sentence of imprisonment if the sentence is to reflect the seriousness of the offenses, promote respect for the law, provide just punishment, and afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(2).

Unlike many defendants who appear before this Court, these defendants were established in business and apparently capable of gainful employment at the time of their crimes. They nonetheless chose to use their talents and knowledge of the real estate industry to deceive those who trusted them and mortgage lenders alike. Especially callous was their treatment of Angel Rodriguez, who described Carmen Soto as akin to a second mother, and Beatrice Shea, who

---

influence the witness"); *United States v. House*, 551 F.3d 694, 699 (7th Cir. 2008) ("The bare attempt to persuade a witness not to offer otherwise truthful testimony would indeed be an attempt to unlawfully influence the outcome of the proceeding."). And of course, the Court may find that the obstruction enhancement is appropriate even if no application note is directly on point; the examples of covered conduct listed in the commentary is illustrative, not exhaustive. *See* U.S.S.G. § 3C1.1 cmt. n.4.

came to Pedro in need and whom the defendants deceived and attempted to bully into taking

actions against her interest.  These crimes are serious and deserve serious punishment.

Moreover, the defendants' illegal conduct was not the product of mere opportunity.

Instead, as reflected in testimony at trial, the defendants' conduct was calculated and deliberate.

Their shared residence functioned as a fraud mill, a place in which the tools and instrumentalities

of their crimes were maintained and deployed in a purposeful manner.  In these circumstances,

Guideline sentences are warranted to promote both specific and general deterrence.  As the First

Circuit has stated, "[d]eterrence of white collar crimes is of central concern to Congress."

*United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006); *see also United States v. Martin*,

455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more

rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are

prime candidates for general deterrence." (internal quotation marks omitted)).

As demonstrated by Steven Soto's involvement in each of the crimes in this case; his

active participation in crimes while incarcerated for an unrelated matter; and his conduct while

awaiting trial, Steven Soto is the most culpable of the defendants and the defendant who has

shown himself least likely to refrain from crime in the future unless sentenced to a sufficiently

lengthy period of incarceration.  However, the fortuity of Steven Soto having been charged in

two separate indictments for similar, related, and temporally-overlapping conduct results in a

Guideline sentence that is greater than necessary to comply with the purposes of sentencing.  *See*

18 U.S.C. § 3553(a)(2).  This phenomenon is exacerbated by the addition of a two-year

consecutive sentence under § 1028A, given that Judge Tauro previously imposed such a sentence

based on the defendant's unlawful use of certain of the same means of identification involved in

this case.  The defendant's identity theft is not the sort for which the government ordinarily

would seek consecutive sentences, were all the identity theft charges included in one indictment. The government therefore recommends a variance that results in a total sentence of imprisonment of 65 months which, when combined with the sentence imposed by Judge Tauro, would result in a total period of incarceration of 102 months.

A sentence of 65 months would avoid an unwarranted disparity between Steven and similarly-situated white collar defendants, including Carmen and Pedro. Such a sentence, viewed in connection with the sentence imposed by Judge Tauro, also adequately reflects the seriousness of Steven Soto's criminal conduct and affords adequate deterrence, both generally and to the defendant. From the perspective of the defendant and the public, a combined jail sentence of 102 months signals that conduct like the defendant's will result in significant punishment.

A sentence that results in Steven Soto serving 102 months for this case and his earlier federal prosecution, combined, is also in harmony with the Guidelines' treatment of the defendant's conduct. If Steven's federal crimes had been included in a single indictment, his total offense level would have been 27 after conviction. The calculation of the GSR would differ from the calculation of the GSR in this case (25) only in the addition of a two-level enhancement based on the number of victims, under USSG § 2B1.1(b)(2)(A) (add two levels if offense involved 10 or more victims).[12] The defendant would be in Criminal History Category II with two criminal history points, as opposed to Category III with five points. The resultant GSR would be 78–97 months. A low-end Guideline sentence plus a two year consecutive sentence for aggravated identity theft would thus total 102 months, which is the combined sentence that would result from the government's recommendation of 65 months in the current case and the 37

---

[12] Judge Tauro applied this enhancement at Steven's earlier sentencing, without objection by the defendant. *See* PSR in *United States v. Soto*, No. 07-10228-JLT at ¶¶ 25, 43.

months to which Judge Tauro sentenced him.  This recommendation puts Steven Soto where he

would have been had he been charged at the outset with all of the conduct at issue in both cases.


                                        Respectfully submitted,

Dated October 3, 2013                   CARMEN M. ORTIZ

                                        United States Attorney

                                By:     */s/ Brian A. Pérez-Daple*
                                        John A. Capin
                                        Brian A. Pérez-Daple
                                        Assistant U.S. Attorneys
                                        John J. Moakley U.S. Courthouse
                                        One Courthouse Way
                                        Boston, MA 02210
                                        (617) 748-3318




                    **CERTIFICATE OF SERVICE**

        I hereby certify that this document, filed through the ECF system, will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing

on October 3, 2013.


                                        */s/ Brian A. Pérez-Daple*
                                        Brian A. Pérez-Daple
                                        Assistant U.S. Attorney